■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RORY SMITH, Appellant. [17 NYS3d 438]—

Appeal by the defendant from a judgment of the Supreme Court, Kings County (Del Giudice, J.), rendered March 8, 2012, convicting him of attempted murder in the second degree and assault in the third degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

The defendant was charged with, inter alia, assault in the third degree and attempted murder in the second degree relating to two altercations with the complainant. The first occurred on July 27, 2010, and the second, an incident during which the defendant repeatedly fired a gun at the complainant, hitting the complainant and his motorcycle, occurred several days thereafter. Both incidents occurred in front of an apartment building in Brooklyn where the defendant resided on the first floor with the mother of his children, Tameka Daniels, and their children. The complainant did not live in the building, but his daughter and her mother, Darlene Powell, resided on the third floor in an apartment facing the front of the building.

The first incident occurred while the complainant was visiting his daughter at the building. The defendant engaged him in a verbal altercation after Daniels accused the complainant's daughter of looking in her first-floor windows. The matter escalated and the complainant and the defendant eventually moved toward the sidewalk to fight. Before their interaction became physical, the defendant walked away, but then came up behind the complainant and punched him in the eye twice which, according to the complainant, broke bones near the complainant's eye. The police were called but the defendant left the scene before the police arrived. Although the responding officer completed a police report, it was never entered into the NYPD database. The complainant sustained an injury to his right eye which required surgery that was scheduled for August 11, 2010.

The day before the scheduled surgery, August 10, 2010, the complainant was visiting his daughter and Powell at their home and he encountered the defendant in front of the building. They exchanged words regarding the prior incident and the defendant accused the complainant of stealing his son's bike. The complainant testified at trial that the defendant told him that he hated him and that, "I got something for you, you understand. You'll bleed soon." The defendant then went inside the building and returned, and, standing on top of the stairs of the stoop, started shooting at the complainant. As the complainant tried to drive off on his motorcycle, the defendant descended the stairs and continued to shoot at him. The complainant sustained three gunshot wounds and his motorcycle had several bullet holes in it. Powell called 911, as did two neighbors who heard shots being fired at that time. The police responded to the scene within minutes and found 11 shell casings on a path from the front door, down the steps, onto the sidewalk, and into the street. The defendant was apprehended 20 days later.

After a jury trial, the defendant was convicted of attempted murder in the second degree and assault in the third degree. At issue in this case is whether any errors during the trial deprived the defendant of a fair trial. We find that they did not. Here, the evidence of the defendant's guilt was overwhelming, and any errors that were made during the trial were harmless, as there is no significant probability that the errors contributed to the defendant's conviction, and they did not deprive the defendant of his constitutional right to a fair trial (*see People v Grant*, 7 NY3d 421, 424 [2006]; *People v Crimmins*, 36 NY2d 230, 237 [1975]).

The evidence as to the identity of the defendant as the perpetrator in both instances was overwhelming. The testimony of both the complainant and Powell, and their respective familiarity with the defendant, established the identification of the defendant as the perpetrator beyond a reasonable doubt (*see People v Arce*, 170 AD2d 238 [1991]). As to the assault, the defendant did not deny that the incident occurred; rather, his testimony that the complainant was the aggressor and that he was defending himself was rejected by the jury. Immediately after the shooting incident, both the complainant and Powell identified the defendant as the perpetrator to the police and identified him at trial as the individual who shot at and who had, on the earlier date, assaulted the complainant.

The complainant testified at the trial that the defendant assaulted him during the first incident and, thereafter, on August 10, he saw the defendant and spoke to him before the defendant told the complainant he hated him and intended to kill him. The complainant testified that, after he heard the gunshots, he realized he was bleeding, looked over his shoulder and saw the defendant firing a gun at him.

Powell also testified that the defendant was the person who, during the first incident, assaulted the complainant, and who shot at and wounded the complainant during the second incident. Powell was familiar with the defendant because she had spent time with both Daniels and the defendant in their apartment. As to the shooting incident, Powell testified that she awoke to the sound of gunshots and looked out her window to see the defendant firing a gun at the complainant from the front door and stoop. Powell testified that she saw the defendant walk down the steps to the street while continuing to shoot at the complainant as the complainant drove away on his motorcycle. Powell testified that, once the complainant was out of sight, she saw the defendant drive off in his light blue van. Although Powell acknowledged on cross-examination that, on the day of the shooting, one of the two windows in her apartment that faced the street contained an air conditioner, the other had a child window guard in place, and she did not open or lean out either window, Powell's testimony that she could see the defendant shooting from the doorway was corroborated by the path of shell casings the police found that led from the doorway to the street.

The contention of our dissenting colleague that the evidence was not overwhelming ignores the physical evidence that corroborated the testimony of the witnesses.

Although the People correctly concede that the Supreme

Court should not have denied the defendant's request to introduce evidence from a private investigator to refute Powell's testimony that she witnessed the shooting from the third-floor windows (*see People v Giles*, 11 NY3d 495, 499 [2008]; *People v Mateo*, 2 NY3d 383, 424-425 [2004]; *People v Primo*, 96 NY2d 351, 355 [2001]; *People v Scarola*, 71 NY2d 769, 777 [1988]), the error was harmless (*see People v Crimmins*, 36 NY2d at 237; *People v Kavazanjian*, 16 AD3d 437 [2005]). Powell testified that she saw the defendant walk down the steps to the street to continue firing at the complainant as he drove away on his motorcycle and that, once the complainant was out of sight, the defendant drove off in his van. The proffered testimony of the private investigator pertained only to Powell's testimony as to whether the steps were visible from the third-floor windows, not the sidewalk or street (*see People v Catalanotte*, 36 NY2d 192, 195 [1975]). Moreover, Powell was cross-examined about what was or was not observable from the third floor windows and, therefore, that issue already was before the jury for consideration (*see People v Bruner*, 222 AD2d 738, 738 [1995]). The dissent discounts the ability of the jurors, who had the opportunity to see and hear the defendant as well as the complainant and Powell, to evaluate the credibility of each and credit or discount the evidence presented (*see People v Romero*, 7 NY3d 633, 644 [2006]; *People v Bleakley*, 69 NY2d 490, 495 [1987]).

We also reject the defendant's contention, adopted by our dissenting colleague, that he was deprived of a fair trial by errors he contends were made by the Supreme Court. A defendant is entitled to a fair trial, not a perfect trial (*see People v Parris*, 4 NY3d 41, 46 [2004]; *People v Flores*, 84 NY2d 184, 187 [1994]; *People v Claudio*, 83 NY2d 76, 80 [1993], citing *United States v Cronic*, 466 US 648, 658 [1984]; *People v Rivera*, 39 NY2d 519, 523 [1976]). Reversal is not warranted here since the errors did not, singly or in combination, deprive the defendant of a fair trial (*see People v Galloway*, 54 NY2d 396 [1981]; *People v Dunbar*, 74 AD3d 1227, 1228 [2010]). We note that many of the alleged errors complained of by the defendant are not errors at all or are unpreserved for appellate review, as the defendant failed to object to them at trial when any error could have been corrected by the trial court (*see* CPL 470.05 [2]; *People v Barcero*, 116 AD3d 1060, 1061 [2014]; *People v Sanabria*, 110 AD3d 1012 [2013]; *People v Collins*, 109 AD3d 482, 482-483 [2013]; *People v Louis*, 99 AD3d 725, 726 [2012]). For example, with respect to the admission at trial of recordings of certain telephone calls that the defendant made when he was at Rikers Island prior to its case-in-chief, the prosecu-

tion provided defense counsel with a log of certain telephone calls made by the defendant while at Rikers Island and informed the court that the People intended to play two of the calls on its direct case, and that the remaining calls potentially would be used to impeach the defendant if he chose to testify. Despite the People's representation that they intended to use numerous Rikers Island calls to impeach the defendant if he chose to testify, no advance ruling was sought by the defendant as to any of those calls before he took the stand.

In any event, the admission of the recordings of certain of the phone calls made by the defendant which related to his prior criminal wrongdoing or immoral acts was not error; the calls were properly admitted to impeach the defendant so that the jury could properly assess his credibility (*see People v Wise*, 46 NY2d 321, 326-327 [1978]; *People v Callender*, 48 AD3d 976, 977 [2008]). For example, when the defendant testified that the only sources of his income were maintenance work, odd jobs, and music producing, he opened the door to the admission of the calls that impeached that testimony, to wit, calls he made discussing income he had received through "dropping women off at men's houses" (*see People v Maerling*, 64 NY2d 134, 140-141 [1984]; *People v Wise*, 46 NY2d at 326-327; *People v Callender*, 48 AD3d at 977; *People v Aponte*, 28 AD3d 672, 672 [2006]). Similarly, the telephone call in which the defendant stated that he was awaiting receipt of a check in another person's name, and that he had the identification to cash the check, was properly admitted as relevant to the defendant's credibility (*see People v Wise*, 46 NY2d at 324, 326; *People v Bradley*, 99 AD3d 934, 937 [2012]; *People v Breedlove*, 61 AD3d 1120, 1122 [2009]). Other phone calls made by the defendant from Rikers Island were properly admitted to show the defendant's consciousness of guilt (*see People v Christiani*, 96 AD3d 870, 871-872 [2012]; *People v Spruill*, 299 AD2d 374, 375 [2002]). To the extent that the court's admission of other phone calls made by the defendant was error, the error was harmless (*see People v Grant*, 7 NY3d 421, 424 [2006]; *People v Crimmins*, 36 NY2d at 241-242; *People v Kennedy*, 101 AD3d 1045, 1046 [2012]; *People v Louis*, 99 AD3d at 726; *People v Duggins*, 1 AD3d 450, 451 [2003], *affd* 3 NY3d 522 [2004]).

To the extent that defense counsel did not object to the alleged errors, such inaction did not deprive the defendant of the effective assistance of counsel (*see Strickland v Washington*, 466 US 668 [1984]; *People v Benevento*, 91 NY2d 708, 712-714 [1998]; *People v Baldi*, 54 NY2d 137, 147 [1981]). Moreover, the record reveals that defense counsel otherwise provided

meaningful representation (*see People v Benevento*, 91 NY2d at 712; *People v Baldi*, 54 NY2d at 147).

The defendant's contention that, in imposing sentence, the Supreme Court penalized him for exercising his right to a jury trial, is without merit. Moreover, the sentence imposed was not excessive (*see People v Suitte*, 90 AD2d 80 [1982]). Rivera, J.P., Miller and Duffy, JJ., concur.

Hinds-Radix, J., dissents, and votes to reverse the judgment appealed from, on the law and as a matter of discretion in the interest of justice, and to order a new trial, with the following memorandum: The defendant was convicted of attempted murder in the second degree and assault in the third degree relating to two altercations with the complainant. The complainant and the defendant came into contact with each other because the complainant's former girlfriend and his daughter lived in the same apartment building as the defendant and the defendant's family.

On July 27, 2010, after an argument between the defendant's daughter and the complainant's daughter, the defendant punched the complainant in the right eye, head, and back. The police were called to the scene by the building superintendent and prepared a complaint report, which was never entered into the NYPD database and was not produced at the trial. The complainant refused an ambulance, but sought medical attention the next day for his eye. According to the complainant, he was told that surgery was necessary to save his right eye, and he was scheduled for surgery on August 11, 2010.

On August 10, 2010, the complainant returned to the building. According to the complainant, as he was standing on the corner outside, the defendant drove up and went into the building, "came right back out," and accused the complainant of stealing his son's bike. They discussed their altercation that had occurred on July 27. The complainant claimed that he told the defendant that it was "all right, it's cool," but the defendant replied that he hated the complainant and wanted to kill him, and walked back toward the building. According to the complainant, he was preparing to leave on his motorcycle when he heard shots, realized he was bleeding, looked over his shoulder, and realized that the defendant was shooting at him from the doorway of the building.

The complainant's former girlfriend testified at the trial that she awoke to the sound of gunshots. At first she thought that the shooting was coming from the hallway because it was so loud, but then she realized that the sound of the shooting was coming from the window. She claimed that, from the window,

she could see the defendant leaning out the front door to the building, firing at the complainant. She acknowledged that there were two windows in her apartment that faced the street and that on the date of the shooting, one window contained an air conditioner and the other had a child window guard in place. She did not open either window and lean out. However, she claimed that, from both windows, she could see the defendant shooting from the doorway from both windows.

The complainant left the scene on his motorcycle, which was disabled by the gunfire. The complainant called the police from a laundromat. The police, responding to a call of shots fired, located the complainant, who was wounded in the wrist, left arm, and lower right leg. He was taken to a hospital, where he was treated and released. The police looked for the defendant for several days, and arrested him on August 30, 2010.

At the trial, the defendant, testifying in his own behalf, admitted that he punched the complainant on July 27, 2010. However, he claimed that he was not present in the vicinity at the time of the shooting, because he was having problems with his girlfriend. He claimed that the last time he was at the building was August 8, 2010, when he attended a barbecue for his son's birthday.

Thus, the defendant's participation in the fist fight was undisputed. In contrast, the evidence of the defendant's involvement in the shooting was attested to by two interested witnesses, the complainant and his former girlfriend, both of whom had a motive to seek retribution against the defendant for causing serious injury to the complainant's right eye. Further, the former girlfriend's testimony as to what she saw was somewhat suspect, since she acknowledged that the gunshot woke her from sleep, giving her little time to make her observations. The physical evidence, consisting of shell casings, and the damages inflicted by the bullets to the complainant's motorcycle and his person, corroborated that a shooting in fact occurred, but not that the defendant was the perpetrator.

Contrary to my colleagues' conclusion, the defendant's defense was not mistaken identification, which was disproved by the fact that the parties knew each other and would not be mistaken (*cf. People v Arce*, 170 AD2d 238 [1991]). Rather, the defendant's defense was that the complainant and his former girlfriend implicated the defendant in the shooting for a purpose not related to his guilt or innocence. Thus, although I agree with my colleagues that the evidence of the defendant's involvement in the fist fight was overwhelming, I cannot agree that that was the case with respect to the shooting.

In my view, the multiple errors committed at the trial cannot be considered harmless. In any event, the errors deprived the defendant of a fair trial. Since the defendant's conviction of attempted murder in the second degree and assault in the third degree was based upon both incidents, his conviction of both of those crimes must be reversed.

At the trial, the defense counsel sought to present the testimony of a witness who was a private investigator and former police detective who took measurements of the doorway of the defendant's building, made observations from the window from which the complainant's former girlfriend claimed she saw the shooting, and would testify that she could not have seen the stoop from the window. The prosecutor argued that that testimony was not relevant, because there was testimony that the defendant was leaning out the doorway, and therefore could have been seen by the complainant's former girlfriend from her window. The defense counsel replied that the witness would testify that one could not see the stoop from that vantage point, and the defendant had a constitutional right to present evidence in his defense. The defense counsel also suggested a hearing outside of the presence of the jury, to determine the relevancy of the witness's testimony. The trial court denied the defendant's application to call the witness, on the ground that "that would be an improper attempt to have a layperson testify as to an opinion."

The People correctly concede that it was error by the court to preclude the defense counsel from calling his private investigator as a witness. A defendant's right to call witnesses in his or her behalf is a constitutional right essential to due process of law (see Chambers v Mississippi, 410 US 284, 294 [1973]; Washington v Texas, 388 US 14, 19 [1967]; People v Gilliam, 37 NY2d 722 [1975]). In the absence of bad faith, the general rule is that where the defendant seeks to call a witness, the witness should be sworn and asked questions, to permit the court, upon proper objection, to rule upon the admissibility of the evidence offered (see People v Cuevas, 67 AD2d 219 [1979]; People v Gilliam, 45 AD2d 744, 745 [1974], revd 37 NY2d 722 [1975]).

Here, the defense counsel's request for a hearing on the admissibility of the witness's testimony was improperly denied on the ground that opinion testimony from lay witnesses is inadmissible. However, there is no categorical proscription against the admission of opinions from lay witnesses (see People v Sanchez, 95 AD3d 241, 249 [2012], affd 21 NY3d 216 [2013]; People v Sheehy, 274 AD2d 844, 845 [2000]; People v Dax, 233 AD2d 177, 178 [1996]; People v Russell, 165 AD2d 327, 332

[1991], *affd* 79 NY2d 1024 [1992]; *Swoboda v We Try Harder*, 128 AD2d 862, 863 [1987]). Further, the proposed testimony about the ability to see a point from another stated vantage point constituted testimony as to the facts—and would not necessarily include opinions (*see People v Alston*, 24 AD3d 391 [2005]; *People v Clark*, 225 AD2d 472 [1996]). Since the defendant had a constitutional right to put forth a defense, contrary to the conclusion of my colleagues, the error cannot be deemed harmless (*see People v Hunter*, 11 NY3d 1, 6-7 [2008]).

My colleagues acknowledge that the complainant's former girlfriend was cross-examined as to what she could see or could not see from those windows, which was an issue of credibility for the jury, who had the opportunity to see and hear the witnesses. Unfortunately, the jury was deprived of the opportunity to see and hear all the witnesses on this issue, depriving the defendant of his fundamental right to the due process of law (*see People v Robinson*, 89 NY2d 648, 653 [1997]).

Contrary to my colleagues' conclusion, the parties did seek advance rulings with respect to certain recorded telephone calls which the defendant made from prison. Unfortunately, those rulings were more honored in their breach than in their observance.

At a pretrial *Sandoval* ruling (*see People v Sandoval*, 34 NY2d 371 [1974]), the trial court ruled that the defendant could be questioned about a prior conviction for false impersonation and the underlying facts thereof. The prosecutor also sought a ruling that the defendant could be questioned about a telephone call that he made on September 7, 2010, wherein he stated that he expected to receive a check for $1,200 which was "not fully in my name . . . it is in a male's name" and "I have the ID and all that," on the ground that the telephone call indicated that the defendant was involved in forgery. However, the trial court ruled that that inference to be drawn from this telephone call was too speculative, and precluded inquiry into the matter.

Nevertheless, when the defendant took the witness stand to testify in this case, he was cross-examined, over objection, about the telephone call he made about the check. After the defense counsel's objection was overruled, despite the court's prior ruling, the prosecutor read into the record the conversation and the defendant's statement that although the check was not "fully" in his name, he had sufficient identification to cash it.

Further, the defendant was cross-examined, over objection, about a telephone call that he made indicating his possible

involvement in prostitution. However, involvement in prostitution was not one of the prior bad acts which the court ruled was a proper subject for cross-examination at the *Sandoval* hearing. The defendant denied involvement in prostitution, but the prosecutor, over objection, persisted in that line of inquiry. The alteration of the *Sandoval* ruling to permit cross-examination of the defendant about alleged misconduct which was not authorized by the *Sandoval* ruling and/or explicitly precluded by the *Sandoval* ruling after the defendant had already taken the stand deprived the defendant of a fair trial (*see People v Fardan*, 82 NY2d 638, 645 [1993]; *People v Fisher*, 104 AD3d 868, 871 [2013]; *People v Perez*, 40 AD3d 1131, 1132 [2007]; *People v Grant*, 234 AD2d 475 [1996]; *People v Beniquez*, 215 AD2d 678, 679 [1995]; *People v Powe*, 146 AD2d 718, 719 [1989]).

The People contend that the defendant opened the door to cross-examination about possible involvement in prostitution and forged checks when he testified that he earned his living as a maintenance worker, cleaning out buildings and taking out garbage, as well as by writing music. However, the fact that the defendant claimed he was involved in legitimate endeavors to earn a living did not open the door to testimony indicating that the defendant had a propensity for criminal conduct (*see People v Moore*, 92 NY2d 823, 825 [1998]; *People v Hicks*, 102 AD2d 173, 183 [1984]). Nor could the People open the door to inadmissible testimony in their favor by asking questions beyond the scope of direct examination such as "Nothing else? There is no other way that you get money?" to which the defendant simply replied "No" (*see People v Melendez*, 55 NY2d 445, 453 [1982]). The prosecutor's cross-examination did not refute the defendant's claim that he earned his living as a maintenance worker, and improperly sought to impeach the defendant with respect to a collateral matter (*see People v Fardan*, 82 NY2d at 646; *People v Wongsam*, 105 AD3d 980, 981 [2013]; *People v Fisher*, 104 AD3d at 871; *People v Beaumont*, 170 AD2d 513 [1991]).

Thereafter, the trial court, in the presence of the jury, reprimanded defense counsel for interrupting the flow of "legitimate cross-examination" with "spurious objections." Outside the presence of the jury, the court specifically reprimanded defense counsel for objecting to "piercing cross-examination of your client allegedly acting as a pimp." Thus, at that juncture, it appeared that further objections by the defense counsel would have been futile (*see People v Mezon*, 80 NY2d 155 [1992]).

Thereafter, the prosecutor, this time without objection, questioned the defendant about a telephone conversation that he had with his girlfriend wherein he stated he wanted to testify before the grand jury but had not, and that he was "pleading the fifth on the shooting." Such testimony was highly prejudicial and in violation of the defendant's constitutional right against the use of his postarrest silence to impeach his credibility (*see People v De George*, 73 NY2d 614, 618 [1989]; *People v Theodore*, 113 AD3d 703, 704 [2014]).

Further, in summation, the prosecutor used evidence improperly adduced on cross-examination of the defendant to urge the jury to convict the defendant based upon his character as "a self-proclaimed hustler. You learned that while he wanted you to think that the only way he makes money is by maintenance, you learned he also makes money pimping out girls" and cashing checks in other people's names. The prosecutor also noted that while he was living with his "babies' mama," he was "running the streets, partying" while the mother of his children was on public assistance. Such comments were highly prejudicial (*see Gutierrez v City of New York*, 205 AD2d 425, 426 [1994]).

Under the circumstances, the defendant was deprived of a fair trial. Accordingly, the judgment appealed from should be reversed, and a new trial ordered.